# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **RICHARD SHIELDS,** *as* | ) | |
| *Guardian Ad Litem of* | ) | |
| **Thomas Sanspree,** | ) | |
| *an incompetent person*, | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
|     **v.** | ) | **CIVIL ACTION NO. 1:24-00318-TFM-N** |
| | ) | |
| **QSHEQUILA EPHRIAM** *and* | ) | |
| **FELICIA WEBB,** | ) | |
|     **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

This civil action is before the Court on the Defendants' separate motions to dismiss under Federal Rule of Civil Procedure 12(b) (Docs# 57, 60) and supporting memoranda (Docs# 58, 61) filed July 17, 2026. The assigned District Judge has referred said motions to the undersigned Magistrate Judge for appropriate action under 28 U.S.C. § 636(a)-(b), Federal Rule of Civil Procedure 72, and S.D. Ala. GenLR 72(a). *See* S.D. Ala. GenLR 72(b); (7/17/2025 & 7/18/2025 electronic reference notations). In accordance with the Court's briefing schedule (Doc# 62), the Plaintiff, Richard Shields, as Guardian Ad Litem of incompetent person Thomas Sanspree (hereinafter, "Sanspree"), filed separate responses in opposition to said motions (Docs# 63, 64), and the Defendants filed replies to the responses (Docs# 65, 66). The motions are now under submission and ripe for disposition. Upon due consideration, the undersigned finds that all claims are due to be **DISMISSED** for the reasons explained, and in the manner set out, below.

## I.    Factual Allegations & Causes of Action[1]

At all times relevant to this action, Sanspree was a pretrial detainee at the Baldwin County Corrections Center ("BCCC") in Bay Minette, Alabama. Sanspree has a documented history of mental illness that has required continuous treatment while incarcerated at the BCCC. A Baldwin County judge has deemed Sanspree mentally incompetent and committed him to the Alabama Department of Mental Health for further treatment.

On May 16, 2024, while awaiting transfer to the custody of the Department of Mental Health, Sanspree began suffering from a mental health crisis, expressing intentions of self-harm and threats of suicide. Defendant Felicia Webb, a private medical contractor nurse at the BCCC, was called to check on Sanspree and evaluate his condition. The decision was made to place Sanspree on observation to allow for more regular monitoring to prevent self-harm attempts. Defendant Qshequila Ephraim, a sergeant at the BCCC, transferred Sanspree to an observation cell for suicide watch.

In the early morning hours of May 17, 2024, Sanspree's condition continued deteriorating and he began engaging in self-harm behavior, prompting Sergeant

---

[1] These allegations and causes of action are taken from the amended complaint filed July 3, 2025 (Doc# 55), with leave of the court under Federal Rule of Civil Procedure 15(a)(2) (*see* Doc# 54), which is currently the operative complaint in this action. *See Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) (per curiam) ("As a general matter, '[a]n amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.'" (quoting *Dresdner Bank AG, Dresdner Bank AG in Hamburg v. M/V OLYMPIA VOYAGER*, 463 F.3d 1210, 1215 (11th Cir. 2006) (citation and quotation omitted))).

Ephraim to place him in a restraining chair in the cell block hall and place a spit mask over his face. The restraining chair is designed to strap an inmate's arms, legs, and body to the chair to prevent movement. Shortly after securing Sanspree to the chair and with the mask, Sergeant Ephraim walked up to him and struck him several times in the face and head with her hand/fist. Sergeant Ephraim then withdrew a taser and threatened to use it on Sanspree. Following this, Sanspree was left in the hallway bound to the chair without Sergeant Ephraim providing any further safety checks or following proper restraining chair protocol that provides for circulatory movement.

While Sanspree was still secured in the chair, Nurse Webb conducted a wellness check of Sanspree's restrains, during which she also struck/shoved Sanspree's head and neck, including a final shove to his head just before walking away. Nurse Webb did not conduct any further safety checks of Sanspree, who was left in the restraining chair for several hours throughout the remainder of the shift without any medical care, mental health care, or further safety/wellness checks. Sanspree suffered from severe headaches, neck pain, and facial pain immediately following the assaults by Sergeant Ephraim and Nurse Webb. Sanspree was ultimately released back to an observation cell, remaining there in isolation until May 24, 2024.

Based on these allegations, Sanspree asserts the following claims:

Counts I & III – Claims under 42 U.S.C.§ 1983 against Sergeant Ephraim for excessive force and deliberate indifference, respectively.

<u>Count III</u> – Section 1983 claim against Nurse Webb for deliberate indifference to a serious medical need.

<u>Count IV</u> – State law claim(s) for assault and battery against both Defendants.

## II.      <u>Analysis</u>

### a.  **Failure to Exhaust under the Prison Litigation Reform Act**

Both Defendants argue that the federal claims in the operative complaint are due to be dismissed because Sanspree failed to first exhaust his administrative remedies before bringing this lawsuit as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").

> The Prison Litigation Reform Act requires prisoners to exhaust all available administrative remedies before suing in a district court. *See* 42 U.S.C. § 1997e(a).[2] Under the Act, "[e]xhaustion is no longer left to the discretion of the district court, but is mandatory." *Woodford v. Ngo*, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). So "a prisoner must 'complete the administrative review process in accordance with the applicable procedural rules.' " *Sims v. Sec'y, Fla. Dep't of Corr.*, 75 F.4th 1224, 1230 (11th Cir. 2023) (quoting *Jones v. Bock*, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L.Ed.2d 798 (2007)). "[W]e look to the requirements of the applicable prison grievance system to determine the boundaries of proper exhaustion." *Id.*
>
> "[D]eciding a motion to dismiss for failure to exhaust administrative remedies [involves] a two-step process." *Turner v. Burnside*, 541 F.3d

---

[2] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).

1077, 1082 (11th Cir. 2008). First, the district court reviews "the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true." *Id.* "If, in that light, the defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." *Id.* Second, "[i]f the complaint is not subject to dismissal at the first step," the district court then "make[s] specific findings in order to resolve the disputed factual issues related to exhaustion." *Id.* After the district court "makes findings on the disputed issues of fact, it then decides whether under those findings the prisoner has exhausted h[er] available administrative remedies." *Id.* at 1083. Throughout this process, "[t]he defendants bear the burden of proving that the plaintiff has failed to exhaust h[er] available administrative remedies." *Id.* at 1082.

*McGuire-Mollica v. Fed. Bureau of Prisons*, 146 F.4th 1308, 1313–14 (11th Cir. 2025).[3]

The Defendants assert, and Sanspree does not dispute, that "the applicable prison grievance system" here is found in Chapter 9 (entitled "Inmate Grievance") on page 48 of the April 9, 2019 edition of the BCCC Inmate Handbook (Doc# 61-2, PageID.1162), which states:

9-1. PROCEDURE: The Inmate Grievance Process is an administrative method used for the settlement of complaints and problems you may have while incarcerated at the Baldwin County Sheriff's Corrections Center. The goal of this procedure is to resolve your situation at the lowest level possible within the Corrections Center. The following will apply:

a. The first action you should take is to try to resolve the problem through the use of an Inmate Request on the Kiosk located in the blocks.

---

[3] "[A] defense of failure to properly exhaust available administrative remedies under the PLRA should be treated as a matter in abatement. This means that procedurally the defense is treated like a defense for lack of jurisdiction, although it is not a jurisdictional matter." *Turner*, 541 F.3d at 1082 (citation and quotation omitted).

If you are not able to resolve the problem informally using the Inmate Request you should:

- Complete an Inmate Grievance on the Kiosk located in the blocks.

- Describe your problem and your desired solution on the grievance.

b. If you have a grievance, you must report it on an Inmate Grievance within five (5) days of the incident. Your grievance will be investigated and answered, in writing, within five (5) days of the time it is received, excluding weekends and holidays. Grievances are first answered by the appropriate staff at the lowest level in the chain of command. If you are not satisfied with the first answer to your grievance, you may send a grievance to the next higher command level. You may continue to send it through the chain of command, up to the Sheriff, who will make the final decision. We will not take any negative action against you because you file a grievance.

c. If your grievance is of a sensitive nature, you may request resolution by any officer within the grievance chain. However, you must explain in writing why you did not file your grievance starting with the POD Officer.

The Defendants allege in their motions that the Inmate Handbook is available to all inmates on a kiosk in their cell block, that each inmate is required to acknowledge that he or she has read the Handbook before using the kiosk, and indeed that an inmate cannot do anything on the kiosk (including submitting Inmate Requests and Inmate Grievances) until acknowledging he or she has read the Handbook. Sanspree allegedly gave such acknowledgment on November 19, 2022, and had submitted other Inmate Requests and Grievances prior to the subject events.

Per the "five (5) days of the incident" requirement of Chapter 9 of the Handbook, Sanspree was required to submit an Inmate Request, and then an Inmate Grievance, on the underlying incidents by May 22, 2026. However, the Defendants allege,

Sanspree's first Inmate Request following the incidents was submitted on May 28, 2024. That Request made no mention of the Defendants or the events underlying his claims, instead stating: "i needa c som1 i kant sleep i think som1 is goin to kill me or hurt me i dont feel safe here kan som1 plz com talk 2 me tks." (Doc# 61-4, PageID.1225). Sanspree submitted that same Inmate Request 2 more times on May 28, 2024, within the span of two minutes from the initial Request, with various jail staff responding the following day that "medical and classification" had been notified and that he would be scheduled to see "Mental Health"/"Ms. Katrina" for evaluation. (*Id.*, PageID.1225-1226). The Defendants allege that Sanspree never followed these Inmate Requests up with formal Inmate Grievances, nor did he attempt to appeal any of the Requests up the chain of command in accordance with section b of Chapter 9.

Sanspree does not contest the Defendants' assertions that he acknowledged reading the Inmate Handbook prior to the underlying incidents in this action, and that he failed to timely submit an Inmate Request and an Inmate Grievance regarding those incidents. Instead, relying on *Ross v. Blake*, 578 U.S. 632, 136 S. Ct. 1850, 195 L. Ed. 2d 117 (2016), Sanspree argues that, due to certain circumstances, the BCCC Inmate Grievance Process was "unavailable" for him to do so.

> In *Ross v. Blake*, 578 U.S. 632, 136 S. Ct. 1850, 1856–57, 195 L. Ed. 2d 117 (2016), the Supreme Court held that § 1997e(a)'s exhaustion requirement is "mandatory" and that courts therefore "may not excuse a failure to exhaust" due to "special circumstances." There is an exception to the exhaustion requirement, however, that is "baked into" § 1997e(a)'s text: "[a]n inmate need exhaust only such administrative remedies as are 'available.' " *Id.* at 1862. "Accordingly, an inmate is

required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.' " *Id.* at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001)). The Court "note[d] as relevant here three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief": (1) when the procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process though machination, misrepresentation, or intimidation." *Id.* at 1859–60.

*Varner v. Shepard*, 11 F.4th 1252, 1258 (11th Cir. 2021).

Sanspree first claims that "he did not have access to the jail kiosk to log a grievance regarding the subject incident within the required five days" because "[d]uring his confinement in the observation cell, [he] could not access to the jail kiosk. It was only after he was released from isolation that the kiosk again became available to Mr. Sanspree." (Doc# 63, PageID.1320; Doc# 64, PageID.1337).[4]  In reply, Sergeant Ephraim explicitly, and Nurse Webb at least implicitly, concede that these allegations get Sanspree past the first *Turner* step for analyzing a motion to dismiss for failure to exhaust administrative remedies. The undersigned must therefore proceed to making "specific findings in order to resolve the disputed factual issues related to

---

[4] Sanspree's response briefs appear to claim that he "remained in isolation for approximately two weeks" after being released from the restraining chair on May 17, 2024. (Doc# 63, PageID.1319; Doc#64, PageID.1337). However, Sanspree's operative complaint alleges that he "remained in an observation cell in isolation until May 24, 2024" (Doc# 55 ¶ 28, PageID.1037), only a week later. The undersigned need not resolve this discrepancy, as the conclusions reached herein would be the same regardless.

8

exhaustion." When, as here, no party has requested an evidentiary hearing on the issue of exhaustion, such findings do not require hearing live testimony, but may instead be made based on affidavits and other exhibits in the record. *See Whatley v. Smith*, 898 F.3d 1072, 1083 & n.58 (11th Cir. 2018); *Bryant v. Rich*, 530 F.3d 1368, 1377 n.16 (11th Cir. 2008).[5]

Sergeant Ephraim in her opening brief, and both of the Defendants in their replies, cite an affidavit provided by Tali Bashan Graves, the Captain of Corrections Command at the BCCC, who avers that "[e]very inmate in the B[CCC] can access a kiosk and submit Inmate Requests and Inmate Grievances, even those inmates in cells designated for close observation or suicide watch." (Doc# 61-1 ¶ 8, PageID.1111). Captain Graves further avers that the BCCC's "kiosk system for Inmate Requests and Inmate Grievances functioned without interruption or any gaps in availability of any sort" at all times relevant to the operative complaint's allegations. (*Id.*). While Sanspree has submitted his own unsworn declaration under 28 U.S.C. § 1746 claiming that he "was not able to access the inmate kiosk during [his] time in isolation" (Doc# 63-1 ¶ 12, PageID.1328), he has not supported that conclusory statement with any specifics. For instance, he does not claim that he requested access to a kiosk while being held in isolation but was refused, or that the BCCC has a policy or custom of

---

[5] A month before the present motions were filed, the Supreme Court held that "parties are entitled to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim protected by the Seventh Amendment." *Perttu v. Richards*, 605 U.S. 460, 479, 145 S. Ct. 1793, 222 L. Ed. 2d 108 (2025). However, no party has demanded a jury trial on PLRA exhaustion in his or her briefing, and the undersigned finds that PLRA exhaustion here is not intertwined with the merits of Sanspree's claims.

regularly denying inmates held in isolation/observation cells access to kiosks to make complaints. For all Sanspree's statement indicates, he simply assumed that, since he did not have the same freedom of movement while in isolation, he would not be able to access a kiosk. However, Captain Graves's affidavit clearly states that he could have.[6] Accordingly, the undersigned finds that Sanspree had access to a kiosk during his time in isolation, and therefore could have submitted a timely Inmate Request and Grievance regarding the May 16-17, 2024 incidents.

Sanspree also claims that administrative remedies were "unavailable" because government officials misled him into believing that he did not have to initiate the Inmate Grievance Procedure for the underlying incidents, and/or that he would be unable to obtain any relief against the Defendants until he was released from jail. Specifically, Sanspree claims that, after the attacks by the Defendants and while he was still in the restraining chair, he requested "to see someone about the incident." (Doc# 63-1 ¶ 8, PageID.1327). That same day, just before Sanspree was removed from the chair, two investigators came and spoke to him about the incidents with the Defendants, taking his statement and photos of his injuries. (*Id.* ¶ 9). The

---

[6] Citing the log of his Inmate Requests attached to Sergeant Ephraim's motion to dismiss (Doc# 61-4), Sanspree argues the gap between his May 15, 2024 Inmate Request and his May 28, 2024 Request, coinciding with the time he was kept in isolation, supports his claim that he did not have access to a jail kiosk during that time, especially considering the log shows Sanspree had been submitting requests almost daily in the weeks prior to that gap. While that is some evidence in support of his claim, it does not rule out the possibility that Sanspree could have requested access to a kiosk during that time, as Captain Graves has averred he could, but did not.

10

investigators informed him that they were investigating the incidents and would come back to discuss further. (*Id.*).

Sometime while Sanspree was still being held in isolation, the investigators returned to provide a status update. (*Id.* ¶ 11). During this interview, the investigators asked Sanspree if he wanted to pursue charges against the Defendants, with Sanspree responding that he "would have to think about it." (*Id.* ¶ 11, PageID.1327-1328). Sanspree was informed then that he would have to be released from jail before he could file charges against the Defendants. (*Id.* ¶ 11, PageID.1328). After Sanspree was released from isolation, he put in a kiosk request to speak with the investigators about wanting to pursue charges, but was told he could contact the investigator once he was released from jail. (*Id.* ¶ 12).[7]

Even accepting these assertions as true for purposes of the present motion, they more closely resemble the "special circumstances" for excusing exhaustion that the Supreme Court expressly rejected in *Ross*. In that case, the inmate plaintiff, Shaidon Blake, reported an assault by two prison guards, Michael Ross and James Madigan, to a senior corrections officer, who referred the incident to the Maryland

---

[7] On May 29, 2024, Sanspree submitted two Inmate Requests, both of which expressed fear for his safety and asked for a "capt lusk" to come speak to him. A jail employee responded to both requests within 30 minutes, saying: "I will pass your message along to the investigator." (Doc# 61-4, PageID.1226-1227). Captain Nathan Lusk was one of the internal affairs officers who investigated the subject incident between Sergeant Ephraim and Sanspree and held a disciplinary hearing with Sergeant Ephraim. On May 31, 2024, wrote a report finding that Sergeant Ephraim had acted inappropriately during the incident and determining that she should receive a demotion and a two-day suspension without pay, among other discipline. (*See* Doc# 61-5, PageID.1306-1309). The then-sheriff of Baldwin County upheld that decision on appeal. (*See id.*, PageID.1305).

11

state prison system's Internal Investigative Unit (IIU). 578 U.S. at 636. After conducting a year-long inquiry into the assault, the IIU issued a final report condemning the actions of Madigan while making no findings as to Ross. *Id.*

Blake subsequently sued both guards under § 1983, and Ross raised the defense of failure to exhaust administrative remedies, "contending that Blake had brought suit without first following the prison's prescribed procedures for obtaining an administrative remedy." *Id.* at 636-37. Blake acknowledged failing to do so, but argued that he believed "the IIU investigation served as a substitute for that otherwise standard process." *Id.* at 637. The district court rejected that explanation and dismissed Blake's claims against Ross for failure to exhaust, but a divided panel of the Fourth Circuit Court of Appeals reversed. *Id.* Adopting "an extra-textual exception originally formulated by the Second Circuit" Court of Appeals, the Fourth Circuit panel majority held that there "are certain 'special circumstances' in which, though administrative remedies may have been available, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Id.* (quotation omitted). "In particular," the panel majority found, "that was true when a prisoner reasonably—even though mistakenly—believed that he had sufficiently exhausted his remedies." *Id.* (quotation marks omitted). The majority concluded that Blake "fit within that exception because he reasonably thought that the IIU's investigation removed his complaint from the typical [prison grievance] process." *Id.* (alteration added) (quotation omitted).

Rejecting the Fourth Circuit's "special circumstances" exception to PLRA exhaustion, the Supreme Court instead held that the relevant inquiry is whether administrative remedies are "available" to an inmate, *id.* at 638-42, and remanded the case to the lower courts to determine whether PLRA exhaustion should be excused under that standard. *Id.* at 648-49. In so doing, the Court noted that material in the record supported Blake's claim "that once the IIU commences…an inquiry, a prisoner *cannot* obtain relief through the standard [prison grievance] process— whatever the [official Inmate] Handbook may say to the contrary"—in particular, numerous administrative dispositions from other prisoner suits indicating that prison wardens routinely dismissed prisoner grievances as "procedurally improper when parallel IIU investigations are pending." *Id.* at 645-46. Such material, the Court found, warranted "further consideration [by the lower courts] of whether Blake had 'available remedies to exhaust." *Id.* at 648. The Court highlighted the following issues for consideration on remand:

> First, did Maryland's standard grievance procedures potentially offer relief to Blake or, alternatively, did the IIU investigation into his assault foreclose that possibility? Second, even if the former, were those procedures knowable by an ordinary prisoner in Blake's situation, or was the system so confusing that no such inmate could make use of it? And finally, is there persuasive evidence that Maryland officials thwarted the effective invocation of the administrative process through threats, game-playing, or misrepresentations, either on a system-wide basis or in the individual case?

*Id.* The Court stated that if the lower court "accepts Blake's probable arguments on one or more of these scores, then it should find (consistent this time with the PLRA)

13

that his suit may proceed even though he did not" exhaust the usual prison grievance process. *Id.*

Here, Sanspree has not presented any evidence similar to Blake's indicating that the BCCC's Inmate Grievance Process was made "unavailable" by the actions of the investigators. Sanspree does not claim that the Inmate Grievance Process was too confusing to effectively use. He does not claim that the investigators, or any other prison official, expressly advised him not to initiate the Inmate Grievance Process, or that inmate grievances concerning active investigations are regularly rejected. At most, Sanspree was told that he would need to be released from jail before he could "pursue charges" against the Defendants over the underlying incidents. However, even if such representations were true, that supposed unavailability of one form of relief did not foreclose other forms of relief being granted through the Inmate Grievance Process (e.g., non-criminal disciplinary actions against the Defendants; administratively barring the Defendants from having further contact with Sanspree; providing some form of compensation over the incidents). *See Woodford*, 548 U.S. at 85 (under the PLRA, "a prisoner must now exhaust administrative remedies even where the relief sought—monetary damages—cannot be granted by the administrative process"); *id.* at 94-95 ("Requiring proper exhaustion…gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors. This is particularly important in relation to state corrections systems because it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more

14

intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.' *Preiser v. Rodriguez*, 411 U.S. 475, 491–492, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973)…The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules."); *Booth v. Churner*, 532 U.S. 731, 741 n.6, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.").[8]

---

[8] Sergeant Ephraim has also argued that Sanspree's § 1983 excessive-force claim against her should be dismissed because Sanspree alleges it as a "clear violation of [his] constitutionally protected right to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution" (Doc# 55 ¶ 38, PageID.1038), even though the Eighth Amendment only applies to convicted prisoners, rather than pretrial detainees such as Sanspree. *See Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021) ("[U]nder the Supreme Court's current framework, the Fourth Amendment covers arrestees, the Eighth Amendment covers prisoners, and the Fourteenth Amendment covers those who exist in the in-between—pretrial detainees." (quotation omitted)); *Patel v. Lanier Cnty. Georgia*, 969 F.3d 1173, 1181-82 (11th Cir. 2020) (explaining how the test governing Fourteenth Amendment excessive-force claims by pretrial detainees resembles that governing such claims brought by arrestees under the Fourth Amendment, rather than the Eighth Amendment). Even if Sanspree's invocation of the Eighth Amendment and its prohibition of "cruel and unusual punishment" in making this claim is improper, such allegations are at most surplusage that do not nullify Sanspree's additional invocation of the Fourteenth Amendment, which Sergeant Ephraim concedes is proper. *See* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). If this claim were not due to be dismissed for failure to exhaust administrative remedies, striking the offending references to the Eighth Amendment under Federal Rule of Civil Procedure 12(f), or allowing amendment under Federal Rule of Civil Procedure 15(a)(2), would be a more appropriate remedy than outright dismissal.

For the foregoing reasons, the undersigned finds that the BCCC's Inmate Grievance Procedure was "available" to Sanspree to timely report the underlying incidents involving the Defendants, but he failed to do so.[9] Moreover, no party has claimed that the BCCC's Inmate Grievance Procedure provides grounds for consideration of an untimely Inmate Grievance. Accordingly, the Defendants' motions to dismiss are due to be **GRANTED** as to Sanspree's federal claims in the operative complaint,[10] such that those claims are due to be **DISMISSED with prejudice** under Federal Rule of Civil Procedure 12(b) for failure to exhaust administrative remedies under the PLRA.[11]

---

[9] Because Sanspree did not properly complete the first step of the BCCC's Inmate Grievance Procedure, the undersigned need not address whether Sanspree's failure to appeal any of his untimely Inmate Requests or Grievances also shows failure to exhaust. *See Bryant*, 530 F.3d at 1378 ("To exhaust administrative remedies in accordance with the PLRA, prisoners must properly take *each step* within the administrative process." (emphasis added) (quotation omitted)).

[10] The present motions request dismissal under both Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted, with Sergeant Ephraim expressly invoking both with regard to dismissal for failure to exhaust. Neither one of those rules, however, is appropriate for such a dismissal. True, the Eleventh Circuit has recognized that PLRA "exhaustion should be decided on a Rule 12(b) motion to dismiss[,]" but it has also conceded that "motions to dismiss for failure to exhaust are not expressly mentioned in Rule 12(b)…" *Bryant*, 530 F.3d at 1375. PLRA exhaustion does not implicate a court's jurisdiction, *see* n.3, *supra*; *Bryant*, 530 F.3d at 1374 & n.10, and thus dismissal under Rule 12(b)(1) is not appropriate. Moreover, in this case it is "not adjudicated as part of the merits" and so "is unlike a defense under Rule 12(b)(6)…, which is generally decided on the merits." *Bryant*, 530 F.3d at 1376 n.12. Considering the foregoing precedent, the best course appears to be to simply dismiss for failure to exhaust under Rule 12(b), without citing a specific subsection of that rule.

[11] *See Johnson v. Meadows*, 418 F.3d 1152, 1159 (11th Cir. 2005) ("[W]e hold that the PLRA's exhaustion requirement does contain a procedural default component:

16

### b. Supplemental Jurisdiction

If all federal claims are dismissed as recommended above, that leaves only Sanspree's state law claims.[12] Sanspree has not invoked diversity of citizenship under 28 U.S.C. § 1332 as a basis for subject-matter jurisdiction, nor has he cited any specific statutory grant of jurisdiction that gives this Court original jurisdiction over all claims. Accordingly, the only basis for subject-matter jurisdiction in this action is original jurisdiction over the federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).[13]

---

Prisoners must timely meet the deadlines or the good cause standard of Georgia's administrative grievance procedures before filing a federal claim. Therefore, Johnson's grievance, which he filed out-of-time and without good cause, is not sufficient to exhaust his administrative remedies for purposes of the PLRA exhaustion requirement."); *Bryant*, 530 F.3d at 1375 n.11 (suggesting in dicta that a dismissal for failure to exhaust may be with prejudice where administrative remedies are no longer available due to time-limits for initiating and there are no apparent grounds for excusing an untimely grievance (citing *Johnson,* 418 F.3d at 1157)).

[12] Nurse Webb has argued that Sanspree's state law claims against her for assault and battery are subject to the Alabama Medical Liability Act, and are due to be dismissed under Rule 12(b)(6) because they are not pleaded with the specificity required by the Act. Sanspree argues in response that those claims are not covered by the Act. Even assuming they are, however, the Eleventh Circuit Court of Appeals has held that similar heightened state pleading standards do not apply in federal court. *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259–61 (11th Cir. 2015). Thus, dismissal of those claims on this basis is not warranted.

[13] *See Baltin v. Alaron Trading Corp.*, 128 F.3d 1466, 1469 (11th Cir. 1997) (generally, "[i]n a given case, a federal district court must have at least one of three types of subject matter jurisdiction: (1) jurisdiction under a specific statutory grant; (2) federal question jurisdiction pursuant to 28 U.S.C. § 1331; or (3) diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)."); *Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 863, 865 (11th Cir. 2022) ("One such circumstance [for exercising supplemental jurisdiction] is when the state claims arise out of a common nucleus of operative fact with a substantial federal claim." (quotation omitted)).

17

However, a district court "may decline to exercise supplemental jurisdiction over a claim" in certain circumstances, such as when it "has dismissed all claims over which it has original jurisdiction…" 28 U.S.C. § 1367(c)(3). On this point, the Eleventh Circuit has stated:

> Although the district court has discretion, concerns of federalism—namely, of federal courts of limited jurisdiction weighing in on state law—counsel in favor of dismissing state-law claims after the federal claims are dismissed. "We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004). The Supreme Court has also put a thumb on the scale: "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise [pendent] jurisdiction ...." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988). A district court, exercising its already broad discretion, will rarely err by declining supplemental jurisdiction after the federal claims that supported its jurisdiction are dismissed.

*Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 863, 866 (11th Cir. 2022).

Both Defendants have requested in their motions that the Court decline to continue exercising supplemental jurisdiction over Sanspree's state law claims in the event it dismisses his federal claims.[14] Sanspree has not argued any grounds for why the Court should retain supplemental jurisdiction if his federal claims are dismissed, and the undersigned finds no special or unusual circumstances apparent in the record that weigh against the "usual" practice of declining supplemental jurisdiction

---

[14] While both Defendants cite Rule 12(b)(1) in making this request, that is not the appropriate procedural vehicle because a court does not "lack…subject-matter jurisdiction" over state law claims once all federal claims are dismissed. Rather, the court maintains supplemental jurisdiction over those claims, but has the discretion to decline to continue exercising it.

18

following dismissal of all federal claims. Accordingly, if the Court dismisses Sanspree's federal claims as recommended above, the undersigned further recommends that the Court **GRANT** the present motions to the extent they request the Court to decline to continue exercising supplemental jurisdiction over Sanspree's state law claims, such that those claims should be **DISMISSED without prejudice** to him timely refiling them in state court. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018) ("Although it is possible for the district court to continue to exercise supplemental jurisdiction over these pendant claims, the district court instead chooses to dismiss the state law claims, it usually should do so without prejudice as to refiling in state court." (citation omitted)); 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."); *Artis v. D.C.*, 583 U.S. 71, 75, 138 S. Ct. 594, 199 L. Ed. 2d 473 (2018) (holding that § 1367(d) serves to "stop the clock" on a state limitations period, rather than to simply provide "a 30–day grace period for refiling" in state court).

### III.    Conclusion

In accordance with the foregoing analysis, the undersigned **RECOMMENDS** that the Defendants' motions to dismiss (Docs# 57, 60) be **GRANTED in part** and **DENIED in part**, such that the following relief be granted:

19

1. That all federal claims asserted in the operative complaint (Doc# 55) be **DISMISSED with prejudice** under Rule 12(b) for failure to exhaust administrative remedies under the PLRA;

2. That the Court then decline to continue exercising supplemental jurisdiction over the state law claims in the operative complaint under § 1367(c)(3), and accordingly **DISMISS** those claims **without prejudice** so that they may be timely refiled in state court; and

3. That, all claims and causes of action having been adjudicated, such final judgment be set out by separate document in accordance with Federal Rule of Civil Procedure 58

### NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within 14 days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error

20

if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the **20th** day of **February 2026**.

/s/ *Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

21